IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Case No. 2:25CR00052 |
| vs. | : | |
| ROBERT BERNDT, | : | JUDGE SARGUS |
| Defendant. | : | |

**DEFENDANT ROBERT BERNDT'S SENTENCING MEMORANDUM AND RESPONSE TO COURT'S NOTICE OF UPWARD VARIANCE**

**I.    INTRODUCTION**

Defendant Robert Berndt is before the Court for sentencing following his guilty plea to Count 1 of the Information which charged him with conspiracy to create and distribute animal crush videos in violation of 18 U.S.C. §371. The probation officer calculated the Sentencing Guideline range based on a total offense level of 21 and criminal history category I. There is one outstanding objection relating to the aggravating role enhancement. The Court also notified the parties that it is contemplating an upward variance and directed them to address whether an upward variance was warranted under the circumstances of the case.

**II.   UPWARD DEPARTURE IS NOT WARRANTED**

A district court may vary outside of the Guidelines if it explains how the present case is different from the typical or mine-run case that occupies the 'heartland' to which the Commission intends individual Guidelines to apply. *U.S. v. Perez-Rodriguez,* 960 F.3d 748 (6th Cir. 2020) (citing *Gall v. United States,* 552 U.S. 38, 51 (2007). While the creation and distribution of monkey torture videos involving "monkeys being beaten, and tortured, both sexually and by having their

limbs cut off," is undeniably horrific and upsetting, the elements of the offense and Guidelines already account for the "heinous and cruel nature of the offenses" at issue. Under 18 USC §48(f)(2), the definition of "animal crushing" fully captures the offense conduct (and content). The statutory term refers to "non-human mammals, purposely crushed, burned, drowned, suffocated, impaled, or otherwise subjected to serious bodily injury." In addition, the parties also agreed that a four-level enhancement for "sadistic and masochistic conduct" should apply. §2G3.1(b)(4). Therefore, if there was any doubt as to whether the Guidelines adequately punished an offender for conduct that went beyond merely showing animals being "crushed, burned, drowned, suffocated, impaled, or otherwise subjected to serious bodily injury," the Guidelines offer this additional enhancement to recognize the sadistic and masochistic nature of the videos.

The stipulated four-point enhancement for "sadistic and masochistic conduct" under §2G3.1(b)(4) is identical to the enhancement in Chapter §G2.2 addressing material involving the sexual exploitation of a minor. §2G2.2(b)(4) assess four points if the material portrays (A) sadistic of masochistic conduct or other depictions of violence; or (B) sexual abuse or exploitation of an infant or toddler. In sum, while the circumstances of this offense may be somewhat new (perhaps adding to the upsetting nature of the conduct), the Guidelines already adequately account for the extreme characteristics of the conduct and heinous and cruel nature of the offense.

In addition to the Guidelines twice accounting for the "heinous and cruel nature of the offenses," the conduct also appears to have deprived Defendant of the opportunity to benefit as a zero-point offender under §4C1.1. Although there is very little guidance on this new provision, §4C1.1 excludes otherwise eligible offenders who used violence or credible threats of violence, or the offense resulted in death or serious bodily injury. §§4C1.1(a)(3) and (4).

Defendant further submits that the significant and documented mitigating evidence and

2

§3553 factors, including comprehensive cooperation with the government, no prior criminal history, and documented mental disability, further demonstrate that an upward departure is not warranted. Given Robert's lack of criminal history and commendable progress while on pretrial release, there is little doubt that additional time in prison will serve any purpose other than punishment. Robert understands and accepts that he faces a severe punishment. However, additional prison time beyond what is fully reflected in the Guidelines calculation is not warranted.

### III. SENTENCING GUIDELINES

The probation officer's Guideline calculation appears to follow the joint recommendation in the parties' plea agreement. However, the parties disagree as to whether Defendant should receive an aggravating role enhancement. The probation officer calculated a total offense level 21 and criminal history category I, resulting in an advisory guideline range of 37-46 months. This includes the probation officer's 3-point assessment for his manager/supervisor role. PSR, ¶59.

The grounds for Defendant's objection to the enhancement is set forth below and includes the fact that Defendant never had any control over any of his coconspirators. In addition, codefendant Robert Bedra, the recognized leader of the conspiracy, and individual who "pitched the tent" and invited others to come, and directed as least one videographer, received a 3-point enhancement for his leadership role. *U.S. v. Bedra,* 2:24cr-48, Sentencing Transcript, p. 18. Because Defendant's role in the conspiracy is not comparable to Bedra, he should not receive the same enhancement.

#### Objection to Aggravating Role

In support of a purported leadership role, the Government can only point to a few hand-picked, typed telegram messages from various time periods that fail to accurately provide the full context of what was taking place and what was being discussed amongst the participants in the

3

group. Moreover, these strategically selected messages only represent Robert's chat messages, and not the messages from the other members. Further diluting the Government's position is the fact that the messages were sent at or around the same time that the group members were actively engaged in <u>both</u> text and voice chats for hours on end. As a result, the Government's interpretation of the selected in inaccurate and unfair.

Robert acknowledges that because of his skillset associated with being able to set up chat groups, he had a role in updating the existing format and setup for the group for <u>already existing members</u>. The Government morphed this discrete task into evidence of a leadership role for the entire conspiracy. In reality, <u>all</u> members had administrator rights and the ability to block, ban and admit new members.

The Government's attachment containing sent messages from June 2023 (appearing in blue bubbles) relate to an event where Robert removed co-conspirator, Katrina Favret ("Kat") from the group after she lost her device and created a new login that did not match her old one. She was never banned from the group; in fact, she re-entered the group the same day with a new account. During the time period leading up to her removal and when she was readmitted, the entire group deliberated (by message and voice chat) on how best to handle the situation. This was a collaborative decision following a spirited discussion on how the group should operate moving forward and how to maintain security within the group and not compromise secrecy in the event a member lost a password, changed devices, etc. This was not a situation where, as the Government asserts, Robert unilaterally used his purported power as a leader to ban Kat from the group and then made up his own rules. Again, pointing to the select messages only written by Robert does not accurately or fairly show the dynamics and roles of each of the members.

The Government's reliance on the screen shots from October 2021 reflect a similar situation where the initial leaders were recklessly distributing material outside of the group and some members were also members of other groups. Those members brought new content to the smaller group. The remaining members of the smaller group (that included Robert) were concerned about protecting themselves from detection and keeping the group private. The screenshots are selected portions of a conversation where Robert merely summarized the collective decision for the smaller group to "be the group which we can open up to people to talk about monkey stuff and share YT links but NO TALK IN HERE ABOUT ADOPTION OR MAKING NEW VIDEOS OR PAYING ETC". The discussion highlights a group decision of the core members from the smaller group to share videos only between themselves, not commission new content, and not recruit new members.

This is also not a situation where, as the Government suggests, Robert took over as the self-appointed (or even elected) leader after codefendant Robert Bedra left the group. On the contrary, Robert often operated as the secretary and transcribed what was discussed to memorialize the group's decision as to their rules going forward. The selected messages detailing the rules are actually a written summary reflecting what the group had already discussed and represented the group's collective decisions on rules moving forward.

To qualify for an enhancement under either Sections 3B1.1 (a) or 3B1.1(b), a defendant must have managed or supervised "one or more participants," and not merely the criminal scheme. See USSG Section 3B1.1, cmt. 2; see also *United States v. Gort-DiDonato*, 109 F.3d 318, 321 (6th Cir. 1997). The United States Court of Appeals for the Sixth Circuit has "repeatedly held that in general, a defendant must have exerted control over at least one individual within a criminal organization for the enhancement of Section 381.1 to be

5

warranted." *United States v. Salyers*, 592 Fed. Appx. 483, 485 (6th Cir. 2015) (internal quotations and citations omitted). Merely playing an essential role in the offense is not equivalent to exercising managerial control over other participants. *United States v. Byrd,* 2024WL2210135, Case Nos. 23-5116/5273 (May 16, 2024, 6th Cir. 2025) (quoting *United States v. Minter,* 80 F.4th 753, 758n (6th Cir. 2023). The Sixth Circuit "derive[s] this 'control' requirement from the commentary to Section 3B1.1, which lays out factors for sentencing courts to consider when applying the enhancement. These factors are: 'the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.' " *Id.*

Robert was an active participant who set up the new platform and memorialized the rules after the group collectively decided how best to continue with the conspiracy and evade detection. The rules of the group were by consensus and not driven by Robert. In addition, all members of the group had the ability to admit and block users; Robert's authority was no different. He did not recruit anyone, direct anyone, financially benefit, or even claim ownership of the contraband. His contribution was limited to offering his skillset as a programmer. While this may have been an important and/or valuable role, it does not come close to the requisite controlling of at least one participant in the illegal activity. Therefore, the aggravating role enhancement is not proper.

## IV. §3553(a) FACTORS

### A. Circumstances of the Offense / History and Characteristics of the Defendant

While Robert was raised in middle class surroundings, with his basic needs being met, he still had a complicated upbringing. He was raised by divorced parents, spending the first part of

6

his childhood with his mother and the latter half with this father, and had to frequently move. Gradually, Robert withdrew from family members and was most comfortable by himself. Robert's isolation continued into his adult years and significantly impacted his social skills and comfort level with interacting with others.

As Robert became an adult, he began to rely heavily on alcohol and drugs to alleviate social discomfort and try to make friends. This behavior took a very dark turn when, at the age of 28, Robert was brutally attacked, raped and robbed by an individual he met the same evening. After this event, Robert's drug use increased and gradually included the abuse of Percocet pills.

Robert's abuse of Percocet quicky evolved into an addiction that required using more and more pills several times a day. To feed his addiction and avoid feeling miserable from withdrawal, Robert turned to the dark web to purchase and make his own poppy tea. He later purchased pills from a Poppy Tea chatroom. Eventually, the pills felt stronger and Robert knew that he was actually purchasing fentanyl pills. He continued to purchase and use them on a daily basis, taking between 30 and 50 pills throughout each day.

In mid-2021, Robert was living alone in Philadelphia, self-employed, and isolating due to the COVID pandemic. He also lost a lot of friends due to his drug use. At the same time, he was deep into his addiction to fentanyl, that was primarily being shipped to him via the dark web. Robert's only social interaction was communicating with others in online chatrooms. Initially, he developed a minor interest in monkey videos on YouTube and would occasionally leave comments on the page. Soon after, others in the conspiracy sent him videos and invited him into another chatroom that included people who shared more violent versions of the same content.

As Robert got to know the other members in the small chatroom, he bonded with them and they became a core group of people who talked about their homelife, shared stories, comforted one

another and became online friends. Even though Robert had no prior history or even remote interest in hurting animals, he became pulled in by the exciting dangerousness of the new content and the acceptance of new friends. In retrospect, he believes that while he does not deny his interest at the time in the dark and troubling content, his participation and conversations escalated. His acceptance and sense of validation with the group seemed to increase when he said more and more violent and troubling things. He also felt that in order to be valued and accepted into the group, he needed to contribute by way of saying horrible things and assisting with the development of the platform. After all, Robert had a computer engineering background and loved working with computers.

In the Spring of 2024, federal agents visited Robert at his home. His involvement with the group immediately stopped and he offered up his devices for inspection. He also started down the seemingly impossible path of weaning himself off of fentanyl. Because his addiction was so severe, he was initially hospitalized for in-patient treatment. Upon his release, he was prescribed Suboxone. He continues to rely on Suboxone and, except for a singular setback due to finding a forgotten ecstasy pill in an old drawer in May 2025, he has remained sober. Robert has abstained from opiates for over a year.

Now that Robert is sober and actively in treatment, he is relieved to be out of the conspiracy. When confronted with copies of his chat conversations from the conspiracy, he was visibly horrified and relayed that he does not even recognize the person writing the chats. He is embarrassed and ashamed of his participation and remorseful for the horrific violence that he and his coconspirators caused. While he does not offer his drug use as an excuse, he believes that his addiction to opiates was a contributor to his involvement. The opiates suspended his empathy function. Once empathy was stripped away, Robert was amplifying off of others' ideas and he saw

his participation as a game to see who could say or suggest the next terrible thing. Robert has no prior history of having engaged or even being interested in animal torture or abuse.

Aside from the incident involving the ecstasy pill over seven months ago, Robert has been in compliance with his bond conditions. His only computer use is heavily monitored and limited to work related tasks. He does not engage in internet gaming, scrolling or social media. He remains horrified by his involvement in the instant offense and has no desire of any kind to engage or view animal crush content. He is still actively engaged in treatment for his opiate addiction.

Shortly after Robert left the conspiracy and sought treatment for his addiction, he turned to his family and shared the terrible details of the scope his addiction and involvement in the instant offense. His family remains supportive of him and submitted compelling and supportive character letters. They are included for the Court's review and consideration in Exhibit A.

### B. Just Punishment, Adequate Deterrence, Protection of the Public, and Needed Treatment

Notwithstanding the fact that the instant offense involves extreme violence and torture, Robert has no prior criminal history and has never before engaged in any type of violent or abusive conduct. Now that he is sober and left the conspiracy, he has no desire to return and/or view the upsetting content that once consumed him. Robert is confident that he will never return to this conduct or view this type of material again. Given these facts and his commendable performance while on pretrial release, the public does not need to be protected from Robert.

Due to Robert's decade long addiction to opioids, history of violent trauma and surprising involvement in the instant offense, Forensic Psychologist Meredith Veltri, Ph.D., ABPP, was asked to evaluate Robert and prepare a report. A copy of the report was provided to the Government and the Court under seal. Dr. Veltri concludes that Robert suffers from posttraumatic

stress disorder and opioid use disorder.

Veltri also reports that there is a nexus between his involvement in the instant offense and his diagnosed conditions:

> The instant offense took place at a time when available data indicate Mr. Berndt experienced impairment due to his trauma-related and depressive symptoms, which resulted in him withdrawing from his sources of social support (including his family) and engaging with others online as a "contrarian" (e.g., internet troll). Further, he was actively using substances to cope with trauma and depression. He was preoccupied with obtaining and using opioids, which he reported using for approximately ten years following his sexual assault. He became increasingly isolated, and he explained that this affected his mood, self-esteem, judgment, interpersonal engagement, and decision-making.

Report, p. 14.

Veltri reports that Robert's "prognosis is favorable with outpatient therapy and an appropriate medication regimen." *Id*. In fact, Robert is already actively in treatment, taking Lexapro and still relies on Suboxone. He is understandably concerned about what will happen, and worried about how he will manage and cope with his treatment plan when he is in prison. Dr. Veltri, a former psychologist for the BOP, reports that the BOP is ill equipped to adequately address Robert's need for specialized trauma and substance use care. *Id.* at 17.

## V.     CONCLUSION

In light of all of the aforementioned factors, Defendant Robert Berndt respectfully requests a below-Guidelines sentence followed by a term of supervised release.

10

Respectfully submitted,

  /s/  Rasheeda Z. Khan
Rasheeda Z. Khan (0075054)
Peterson Conners LLP
545 Metro Place South, Suite 435
Dublin, Ohio  43017
(614) 745-8849 Phone
(614) 220-0197 Fax
rkhan@petersonconners.com
*Attorney for Defendant*
*Robert Berndt*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was electronically served upon Adam Cullman and Nicole Pakiz, Assistant United States Attorneys, Office of the United States Attorney, via the Court's electronic filing system on this 6th day of December 2025.

  /s/  Rasheeda Z. Khan